## Case No. 16,424.

### UNITED STATES v. SUTTER.

[Hoff. Dec. 27.]

District Court, N. D. California. June 10, 1861.[1]

CALIFORNIA LAND GRANTS—LOCATION OF QUANTITY IN LARGE TRACT—CONVEYANCES—ESTOPPEL—SURVEYS.

[1. When a certain quantity has been granted within limits which embrace a much larger tract, the quantity granted is to be located within the exterior limits, at the election of the grantee. Following U. S. v. Fossatt, 21 How. (62 U. S.) 445.]

[2. As a general rule the conveyance by the grantee to third persons of portions of the lands within the exterior limits may justly be considered as an election of the location, and as estopping him to make any subsequent election inconsistent with it. Yet the building of a house and other permanent improvements by the grantee himself would seem to afford as decisive evidence of an election as the conveyance to some other person, and that a subsequent purchaser of the house and improvements might justly claim that the election was made and the location fixed, so as not to be affected by conveyances made after the making of the improvements.]

[3. Therefore the court will treat the building of a house, and surrounding buildings, as locating the grant upon the site thereof to such an extent as, while it satisfies the latter principle, will at the same time protect the right of early grantees, by treating their grants as successive locations of portions of the tract according to their dates.]

HOFFMAN, District Judge. This cause comes up on objections to survey filed on the part of the United States and of various purchasers under [John A.] Sutter, who have intervened in the proceeding, under the act of 1860. The boundaries of the land confirmed to the claimant are described in the decree of the board as follows: "On the south by a line drawn due east from the Sacramento river, so as to touch the most southerly point of a pond or laguna, situated near said river, and about five miles south of the American river, as represented on the map filed in the case, marked B. and B. P. L., exhibit to the deposition of Juan B. Alvarado, March 15, 1855, which line is also marked on said map Lindero, labeled Norte 38° 49′ 32″, on the north by a line drawn due east from the Sacramento river to the southern base of the mountains known as the Buttes, and represented on the said map as Los Tres Picos, and from thence until it intersects the eastern boundary of the tract as represented on said map and described in the grant and in the depositions of said Vioget; on the west by the said river Sacramento, and on the east by the margins of Feather river inclusive. For more particular description, reference to be had to the copies of the grants filed and proved in the case, marked A and C., to the map marked B., and to the depositions of John J. Vioget and Juan B. Alvarado, all of which are filed among the papers in the case."

[1] [Reversed in 2 Wall. (69 U. S.) 562.]

This decree was affirmed by the district court, but on appeal to the supreme court it was reversed, so far as it confirmed the claim for twenty-two leagues under the Sobrante grant, but affirmed with respect to the eleven league grant. Eleven leagues have thus far been surveyed and located, and the survey has been returned into court under the provisions of the act of 1860. In the opinion of the supreme court it is stated that "the cause is remitted to the district court for further proceedings in respect to the location of the grant of Alvarado within the limits set forth in the grant and the accompanying map on file in the case." [21 How. (62 U. S.) 170.] It will be observed that the decree of the board and of this court, which was thus in part reversed and in part affirmed, did not attempt to make any discrimination between the right to eleven leagues acquired under the Alvarado grant and that to twenty-two leagues supposed to have been acquired under the Micheltorena or Sobrante grant. It confirmed to the claimant all the land "within his rancho as laid down on the map which accompanied the grant for eleven leagues." But the claim under the Sobrante grant having been rejected by the supreme court, and the cause remitted that the eleven league grant might be located within the limits set forth in the grant and accompanying diseño, it is evident that the smaller quantity must now be located within the limits decided by the board and this court to be the boundaries of the original map; the only effect of the partial reversal of the decree by the supreme court being to reserve to the nation, i. e., to the United States, the excess beyond the eleven leagues, instead of considering it as conveyed to the claimant under the Sobrante grant. If the limits of the tract out of which the eleven leagues are to be taken had not been so explicitly determined by the decree of the board, and adopted by the supreme court, there might be much room to doubt whether the southern boundary line marked "Lindero latitud norte 38 deg. 49 min. 32 sec.," on the map B. P. L., was in fact intended by the governor to be the southern limit of the tract, out of which the eleven leagues just granted were to be taken. It has unfortunately happened that neither the original grant nor the map which accompanied the petition are before us.

The grant has been burnt and the map lost. The contents of the former we learn from the borrador draft in the archives and from a copy of the original of record in the county clerk's office; but the precise indications of the map, according to which the governor granted, cannot now be ascertained with any certainty. The grant describes the northern boundary as Los Tres Picos, and the parallel of latitude 39 deg. 41 min. 45 sec.; and the southern boundary as the parallel 38 deg. 49 min. 32 sec. In fixing these boundaries it might reasonably be inferred that the governor adopted some lines drawn on the map

before him, and supposed to be, and marked as, the parallels of latitude mentioned in the grant. But on one of the maps presented as copies of the one which accompanied the petition are the two lines found marked as mentioned in the grant. The map "B. P. L." first appears as an exhibit to the deposition of Governor Alvarado. He states that it seems an exact copy of the diseño, except that on the Feather river were marked localities which Sutter thought would be suitable for the settlement of families under him. "I named the degrees of latitude as Sutter had them marked on his diseño. I told him I did not know the latitude; but, as he insisted on having them so, I described them accordingly." The evidence is silent as to the origin of the map B. P. L., thus introduced to our notice. We are not informed when, by whom, from what origin, or for what purpose it was made. But, if the testimony of Alvarado be accurate, it is not a copy of the map attached to the petition, for the northern line of latitude is not 39 deg. 41 min. 45 sec., as mentioned in the grant, and which Alvarado declares he adopted from the diseño, but 39 deg. 32 min. 45 sec. The southern line marked on the map corresponds with the call of the grant, but the map is in this respect inconsistent with itself as will presently be shown. There was also produced by the claimant a map marked A. P. L. This map Vioget states to have been made by him for Captain Sutter in 1843, and to be a true copy of the original, except that some dotted lines are omitted which were intended to mark swampy lands. As Vioget, at the time of Sutter's application for a grant, made two maps of the tract solicited, one of which was sent with the petition, and was the diseño before the governor when the concession was made, and the other was retained by Sutter, it is reasonable to conclude that the copy A. P. L. was made from the latter and not from the former, which remained in the archives at Monterey. The supreme court seem to have supposed that this copy by Vioget was the map filed by the claimant with his petition. But such was not the fact. The map B. P. L., already referred to, was that filed with the petition, while the Vioget copy marked A. P. L. was not produced until some years afterwards. On this latter map the southern parallel of latitude is laid down precisely as in the map B. P. L., but it is marked "latitud norte 38 deg. 41 min. 32 sec." The position of the northern line is in like manner identical with that of the northern line on B. P. L., but it is marked "latitud norte 39 deg. 33 min. 45 sec." If, then, the original of this map was before the governor, it is evident that he did not adopt either parallel of latitude laid down on the map as the boundary of the tract he intended to concede.

It will be observed that not only do the numbers of the northern and southern boundaries on A. P. L. fail to correspond with those mentioned in the grant, but they also differ from those marked on the same lines on B. P. L. For the southern boundary on the latter is numbered 38 deg. 49 min. 32 sec., while on the former it is numbered 38 deg. 41 min. 32 sec.; and the northern parallel on the map B. P. L. is marked 39 deg. 32 min. 45 sec., while on A. P. L. it is 39 deg. 33 min. 45 sec., neither of which latter corresponds with the call of the grant for latitude 39 deg. 41 min. 45 sec. It is stated by Vioget that in making his preliminary survey or reconnaissance of the land to be solicited, he established with such imperfect instruments as he could command the latitude of two points, viz., Sutter's Fort and the junction of the Sacramento and Feather rivers. The latitudes of these two are laid down on both maps. That of the fort is 38 deg. 45 min. 42 sec. The southern boundary is evidently intended to be fixed about four miles to the south of it. This is shown not only by its position on the map, and by reference to natural objects, but by the testimony of Vioget as to the points from which it was drawn. If, then, the map "B. P. L.," or its original, was before the governor when he made the grant, and the southern lindero, as thereon laid down, was adopted by him, it disclosed on its face its own absurdity, for the latitude of the fort is marked 38 deg. 45 min. 42 sec., while the boundary four miles to the south of it is marked 38 deg. 49 min. 32 sec., thus making the latitude increase towards the equator. Vioget himself declares that such a mistake could never have been committed by him, and the map A. P. L., which he testifies was a copy made by himself from the original, would seem to show that it was not in fact committed, for on that map, as already stated, the southern line is marked 38 deg. 41 min. 32 sec., which would be its true latitude, supposing the latitude of the fort four miles to the north of it to have been correctly determined. But notwithstanding this discrepancy, we might have supposed that a map similar to B. P. L. was before the governor when he made the grant, and that by some error the southern boundary was marked 39 deg. 49 min. 32 sec. instead of 38 deg. 41 min. 32 sec., and the numbers so inscribed upon it were adopted by him, if it were not for the circumstance that the northern line of B. P. L. does not answer the call of the grant, —for that instrument mentions, as we have stated, the parallel 39 deg. 41 min. 45 sec. as the northern boundary, while the northern boundary on B. P. L. is marked 39 deg. 32 min. 45 sec. Under these circumstances it is urged by the United States, with much force, that neither of the lines delineated on the maps was intended to be adopted by the governor. That the southern parallel on the map before him must have been marked 38 deg. 41 min. 32 sec., as on A. P. L.; for Vioget himself declares he could not have committed the blunder of making the

latitude increase towards the south, that the northern line must have been marked as on A. P. L., 39 deg. 33 min. 45 sec., and that the governor determined to grant a tract commencing eight miles north of the southern parallel on the map before him, i. e., eight miles north of a line marked 38 deg. 41 min. 45 sec., making north latitude 38 deg. 49 min. 45 sec., and extending a corresponding distance north of the northern parallel 39 deg. 33 min. 45 sec. as marked on the map, making 39 deg. 41 min. 45 sec., which are the boundaries mentioned in the grant. On this theory alone it is urged we can account for the absence on either map of the parallel called for in the grant as the northern boundary.

In explanation of this supposed action of the governor, it is urged that the application of Sutter was for an impressaire grant, or for a grant of lands to be distributed amongst colonists whom he proposed to introduce. That the extensive establishments he had already formed at the fort below the American river, forbade the idea that he could have wished to distribute amongst new colonists any portion of the land he was already in possession of, and to a considerable extent, had improved and cultivated. That the same considerations apprised him that the land occupied by him and lying almost under the guns of his fort would not be granted to any other person, as valdio or vacant, more especially as he had originally settled on it by permission of the governor. He was therefore secure in his possession. But he was desirous as stated in his petition, of "enlarging his enterprise by the introduction of twelve families," and for this purpose he solicited and the governor granted a tract of eleven leagues, without intending to include the land adjacent to the fort already occupied by him. It was only after he had distributed the land just granted, and had thus conferred on the nation what was deemed an important service, that he asked and obtained for his own use, and that of his son, a tract of twenty-two leagues, or eleven leagues each, being the maximum quantity which any individual could obtain for his personal benefit, and the granting of which indicated that the governor supposed he had already distributed the eleven leagues just granted for that purpose, but which he could not have imagined to have included the fort and large establishment of Sutter, on which so much labor and money had been expended. But whatever force there may be in these views, I am compelled, under the decision of the supreme court, to consider the question presented as no longer an open one. In its opinion the court recognizes in the most explicit manner, the map B. P. L. filed with the petition to the board of commissioners, as proved to be that referred to in the grant, and according to which the governor made the concession.

"With this map," says the court, "we have no difficulty in locating the grant so as to include New Helvetia." After alluding to the fact that the exact position of the line of latitude mentioned in the grant is twenty miles to the north of the establishment, the court says: "But the map shows that the line of the southern boundary is south of New Helvetia, and is so related to natural objects represented on it, as to be easily determined. Vioget accounts for the error in the designation of the line by the imperfection of the instruments, and proves that a starting corner was fixed, and the line traced on the ground. This is better evidence of the true location of the southern line, and conforms to the probabilities of the case. Upon the whole evidence we find that the grant and the map filed with the petition in 1852, before the board of commissioners, have been proved." It will of course be noticed that the point more immediately under consideration in the foregoing extract was whether the call in the grant for the parallel of latitude 38 deg. 49 min. 32 sec. should be satisfied by ascertaining with mathematical exactness that parallel, or by adopting a line supposed to be that parallel and so marked on the map. It was of course held that the line actually referred to and intended to be designated by the governor should be adopted, notwithstanding that by reason of imperfect instruments or erroneous observations it might have been incorrectly marked as a certain parallel of latitude. The attention of the court does not appear to have been directed to the circumstance that on the map A. P. L., also produced by the claimants and proved by them to be a copy of the original, the same line is differently marked and does not correspond with the call of the grant, and that on neither A. P. L. or B. P. L. is any northern line found marked as described in that instrument. But whatever may have been the points brought to the notice of the court by counsel, the decision is explicit. The map filed with the petition in 1852, before the board of commissioners, is pronounced to be "proved." That this was the map B. P. L. there can be no doubt. The decree of the board which was affirmed by the supreme court with regard to the eleven league grant, established the southern boundary as the line marked 38 deg. 49 min. 32 sec. on the map B. P. L., and this court is, by the mandate and opinion of the supreme court required to locate the land grant by Alvarado within the limits set forth in the grant and the accompanying map on file in the case. The only effect of the partial reversal of the decree of the board and of this court, was that the surplus land within the limits of the map, instead of passing to Sutter and his son under the Sobrante grant, reverts to the United States. Under this decision of the supreme tribunal, I

have no choice but to consider the map B. P. L. as a copy of that referred to in the grant, and the line of latitude laid down upon it, and marked 38 deg. 49 min. 32 sec. as intended by the governor to be the southern boundary of the tract within which eleven leagues were to be taken and the surplus reserved to the nation.

The survey which is now before the court has been made in conformity with another map, which, for the first time, was produced and placed in the hands of the surveyor when about to make the location. It is marked Exhibit Von Schmidt, No. 2. No proof of its origin or authority is offered. In its general features it corresponds with the other maps produced, but like A. P. L., the southern line of latitude is marked 38, 41, 32; the latitude of the fort, four miles to the north, being marked as on both A. P. L. and B. P. L., 38 deg., 45 min., 42 sec. But it differs from both those maps in having marked upon it in squares colored in green eleven leagues of land,—two to the south of the American river and nine on the margins of Feather river, beginning at a point on that river a short distance to the north of its junction with the Sacramento. Before this map can be treated as fixing the location of the eleven leagues granted by the governor, two points must be established: 1. That it was submitted to him with the petition or before the grant was made. 2. That he adopted his designation of the land solicited and his grant with reference to it. On both these points the proofs almost entirely fail. Governor Alvarado, who was the first witness called to prove the correctness of the map B. P. L., testifies that "that map seems an exact representation of the diseño except that on the latter there were marked on the Feather river localities which Sutter thought would be suitable points for the settlement of families under him." This statement is corroborated by Bidwell, who swears that on the map he saw in the archives certain squares were marked, but he is unable to give their location. But it does not appear from Alvarado's testimony that the localities so indicated by Sutter, as suitable for the settlement of families, were adopted by him as the precise designation of the eleven leagues conceded; and even if they had been so adopted, we shall presently see that they could not have been those delineated on the map recently produced.

In order to explain and establish the location of these squares, alleged to have been marked on the diseño submitted to the governor, the claimant has introduced in evidence the deposition of J. J. Vioget, taken in the case of U. S. v. Covilland [unreported] which was a claim under a grant by Sutter for a portion of the tract granted to him. In this deposition, Vioget describes the manner in which he surveyed and located the eleven leagues intended to be asked for by Sutter. He states, in substance, that he located two leagues south of the American river; that he then ascended the Sacramento to its junction with the Feather river, and thence up the latter to the Canadian ford, where, finding the land to be good, he commenced to lay off the remaining nine leagues; that he laid them off one after another, taking most of the land on the east side of the Feather river,—but each of the nine leagues had a part of it on the west side of the river. The northern line or boundary of the last league he particularly describes as drawn one league in length from west to east. Of that league about one-quarter of a mile was on the west side of Feather river, and the remainder on the east side of it. He further states, that he did not run the eastern lines of the nine leagues. He ran on the west side of the river, and drew the eastern line parallel to it, and the distance of one league from it. It was not a straight line, on account of the bends in the river. From this testimony of Vioget it is very clear that the squares marked by him on the map were of one square league each,—extending one after the other towards the north,—that each of them embraced land on both sides of the river, and that no one of them was more than a league in breadth, from east to west. But the squares, if such they can be called, marked in green on the map recently produced, in no respect conform to this description. All of them, except the first or most southerly, exceed a league in width, and the last is no less than three leagues in width, making the northern line three leagues in length instead of one league, as positively stated by Vioget. It is therefore evident that even on the supposition that Vioget marked the square described by him on the map transmitted to the governor adopted that designation, and granted the precise parcels of land so marked out (which he does not pretend to have done), the green map now exhibited affords no assistance in ascertaining their location. That map stands, therefore, not only wholly unsupported by evidence, but disproved by Vioget himself, whose testimony shows that the squares marked on it are wholly unlike those marked by him on the diseño. But the green map, even if its origin and authenticity had been more satisfactorily established, could hardly now be substituted for the map "B. P. L." which was originally produced by the claimant, and which his counsel so strenuously insist has been decided to be a correct copy of the diseño, by the supreme court. If, then, I am right in declining to consider the suggestions of the United States as to the probable intention of the governor in fixing latitude 38 deg. 49 min. 32 sec. as the southern boundary, and in treating the location of that line as drawn on "B. P. L." as finally determined by the supreme court, I must, for the same reason, refuse to receive a new map, which can control the location only on the supposition that it and not B. P. L. is a true copy of the diseño adopted by the gov-

ernor. But on other grounds it may well be doubted whether the governor intended or Sutter considered the grant as embracing only the specific tracts of land stated by Vioget to have been marked by him on the map. The fact that the earliest distributions of lands by Sutter on execution of the trust on which the grant was made, was, to a considerable extent, of tracts not included in the squares marked out by Vioget, would seem decisive proof that he did not consider his grant to be confined to those specific parcels, but to be, as decided by the supreme court, of eleven leagues, to be located within the general limits set forth in the grant and accompanying diseño.

Dismissing, then, from consideration, the exhibit von Schmidt, No. 2, we are left, as under the decision of the supreme court we should at all events have been compelled to do, to locate the eleven leagues within the general limits described and delineated on the map B. P. L. In the grant the land is described as eleven square leagues, comprehended in the extension which the diseño attached to the expediente marks out, without including the lands overflowed by the currents and force of the rivers, and having for boundaries on the north the three summits (Los Tres Picos) and latitude 39 deg. 41 min. 45 sec. north; on the east, the margins of Feather river; on the south, latitude 38 deg. 49 min. 32 sec. north; and on the west, the Sacramento river. With this description, and with the map B. P. L. which, under the decision of the supreme court, we are bound to accept as an accurate copy of the diseño referred to, it is not difficult to ascertain with the general limits of the tract within which the eleven leagues were to be located. On the south is the line of latitude marked as mentioned in the grant, and its position determined by natural objects. On the west is the river Sacramento. On the north is a line of latitude which, though it is not marked with the same numbers as those mentioned in the grant, is inscribed "lindero," and must be taken to have been intended to be designated by the governor, if we assume, as just stated, that this map, or an accurate copy of it, was before him. The eastern boundary is the margin of Feather river. Unassisted by the diseño, there might perhaps be room for doubt whether by this description it was intended to include both banks of that stream. But now without referring to the map it would seem most probable that the governor, if he had intended to bound the tract on the east by the Feather river, i. e., to make it include only the west bank of the stream, would have said so in terms. It is not pretended that the grant included the west bank of the Sacramento river, for the grant using the most obvious and natural form of expression bounds the tract on the west by the Sacramento river. But in fixing the eastern boundary, the governor varies the phrase-

ology and declares that boundary to be not the Feather river but the margins of the Feather river. All doubt, however, is removed by recurring to the map. On either side of the Feather river on the east side of the Sacramento, as well as on the north and south sides of the American, is extended a dotted line, evidently intended to indicate the land solicited and to mark the division between the available lands on the margin of those streams, and the overflowed and tule lands, which beginning at a greater or less distance from their banks, extend over so large a portion of the country. Towards the north, as we ascend the Feather river, these lines diverge, leaving a considerable tract of good land on either side of the stream, while along the Sacramento, both above and below its junction with the Feather, the line of tule or swamp land approaches to within a short distance of its margin. It is shown by the testimony that these dotted lines along the Feather river and along the Sacramento, above the mouth of the American river, indicate with as much exactness as could be expected, the limits of the high lands susceptible of occupation and cultivation as distinguished from the tule lands. And we have the direct testimony of Vioget to the fact that they were drawn with that intention. When, therefore, the governor, with a copy of this map before him, declared that the eleven leagues granted were comprehended within the extent of country delineated on the diseño, without including lands overflowed by the currents of the river, it is reasonable to suppose that he referred to and adopted the discrimination between the high and the overflowed lands, which was so clearly made on the diseño. If this be the true construction of the description in the grant as explained and aided by the indications of the diseño, the question as to location presented in this case does not materially differ from that which so often arises in this class of cases, viz., when a certain quantity is granted within limits which embrace a much larger quantity by what rule is the location of the quantity granted to be determined? Under the Mexican system the duty of laying off and segregating the granted land properly belonged to the magistrate who gave judicial possession. There is no reason, however, to suppose that in measuring the land according to the ordinances the party interested was not allowed to exercise a reasonable election as to its location, provided he did not give it such a form as would be inconvenient and impair the value of the adjoining public domain. U. S. v. Fremont, 17 How. [58 U. S.] 505. It was accordingly held by the supreme court in U. S. v. Fossatt, 21 How. (62 U. S.) 445, that one league confirmed in that case was to be located within the exterior limits of the grant at the election of the grantee or his assigns. But in many of the cases presented to this court it has appeared

that the whole tract within the exterior limits has been sold by the grantee to various purchasers, or a part has been sold, perhaps equal to the whole quantity granted, and the remainder retained by the grantee. A contest thus inevitably arose either between the purchasers inter sese, or between them and the grantee, as to the location of the land confirmed. As between the different purchasers there seemed no rule to be adopted but to treat the conveyances as operating as an election on the part of the grantee of the land conveyed, and as estopping him, or subsequent purchasers under him, to float the grant to any other portion of the tract included within the exterior limits than that whereon, by his deeds, he had declared it to be located. This rule, though it has not received the sanction of the supreme court, has, it is believed, been acquiesced in by the bar and the suitors, and it is commended to us by its reasonableness and justice. For nothing would be more unjust than to allow a grantee, after disposing of large portions of the land within the exterior limits mentioned in his grants,—after extensive improvements have been made and numerous persons holding under a title derived from him have settled upon the land,—to elect a location of the quantity confirmed on an entirely different portion of the tract, so as not only to leave without title those to whom he had conveyed, but perhaps to embrace the lands of settlers, who, relying upon his first election, have treated the sobrante or excess beyond the quantity granted as vacant public land. But if this rule, which thus protects purchasers under an ordinary grantee, be just, it should, a fortiori, be applied to a case like the present. For the grant to Sutter was not the usual grant to an individual colonist, but was asked for and made to him by an impressario.

In this petition to the governor, Captain Sutter, after referring to the extensive establishment which by the permission of the government he had already formed, proceeds to say: "For all these reasons he finds himself under the necessity of enlarging his enterprise by establishing twelve families, and to solicit the kindness of your excellency that you may be pleased to grant him eleven leagues of land in his establishment of New Helvetia, situated towards the north, according to the land represented in the sketch which he has the honor to present to your excellency." The governor accordingly makes the grant, subject to the approval, not of the departmental assembly, as was usual in grants to individuals for their own benefit, but to that of the supreme government as was required by law when grants were made to impressarios for the purpose of distribution among settlers. When therefore, Sutter, having obtained this grant, proceeded to distribute it among various settlers, he was for executing the trust, and rendering the consideration on which the grant had been made. Nor should he, or subsequent purchasers under him, for he is understood to have parted with all his interest in the claim, be permitted now to locate the grant so as not to include the lands distributed by himself amongst his early colonists.

As against a grantee, or purchasers under him, seeking to exercise the right of electing a location, subsequently to and differing from a location already constructively elected by deeds of conveyance, the reasoning above mentioned would seem conclusive. But it commonly happens that soon after obtaining his grant, and prior to any conveyance of any portion of the land, the grantee has erected a dwelling house, corrals, etc., and has cultivated portions, more or less extensive, of his land—ignorant of the dimensions of the tract within his exterior boundaries; or supposing, as was formerly not uncommon, that his grant was by metes and bounds, and that the whole tract within his exterior boundaries would be confirmed to him, he may have conveyed away portions remote from his houses and cultivations—the purchaser perhaps taking the risk of having the land purchased included in the survey—and it may be, paying a price less than its value by reason of the uncertainty as to the location. But the grantee or a subsequent purchaser under him might, notwithstanding such conveyance, insist that no location should be made so as to exclude his ancient dwelling house, his corrals, and his cultivated fields. He might urge with great force that his occupation and cultivation constituted the principal equity of his claim; that it would be absurd to confirm his claim because he had settled upon and improved it, and afterwards to declare that his house and improvements were not upon his own, but upon public land. He might also urge that the erection of a house and corrals—the cultivation of the adjacent land—especially when effected at great expense and followed by a residence of many years, are acts which indicate an election far more unmistakably and emphatically than any conveyances could do—and that subsequent purchasers of remote parts of the tract are affected with notice of the fact that so far as his homestead and adjacent lands are concerned his election was already made, and the location fixed. So, too, the purchaser of his house and improvements might reasonably claim that wherever the grant might finally be located, it ought at all events to include what the grantee had by acts so notorious and unmistakable averred it to embrace. And the location so originally made by the grantee should not be affected by the execution of perhaps quitclaim deeds, without consideration, of which he, the purchaser of the house and improved land, neither had nor could have had any notice. In addition to this, when we consider how readily frauds

upon the purchase of the homestead or even upon settlers (who naturally look to the house and settlement of the grantee as determining the location of the tract), might be committed by means of antedated conveyances, it will, I think, be apparent that the mere execution of deeds to purchasers cannot in all cases be accepted as an election by the grantee of the location of the land which is to be adopted by this court by causing the survey to be made of the tracts so conveyed, including them successively in the order of their dates until the whole quantity granted be obtained.

If, then, in any case, the grantee could be deemed by his occupation and cultivation to have fixed the location of the grant as against any subsequent purchases of other portions of it, Sutter must surely be considered to have done so. As early as 1839 and two years before the date of the grant, he had formed a settlement near the junction of the American and Sacramento rivers, which he named New Helvetia. In the year 1841 he commenced the erection of a fort at his own expense, having previously been commissioned by the government to guard the northern frontier. The fort was surrounded by a high wall, and was defended with cannon. Within it were dwelling houses for his servants and workmen, and workshops for the manufacture of various articles of necessity. A grist mill, a tannery and a dis'illery were attached to the establishment. A number of Indians were domesticated by him, and contributed to cultivate his fields of grain, and to defend the settlement from more savage tribes. He was possessed of several thousands of horses and neat cattle, which were under the care of his servants. There were collected at different times from twenty to fifty families, and there were in the course of years some hundreds of persons connected with the establishment. U. S. v. Fossatt, 21 How. [62 U. S.] 172. Such was the character of the establishment to which Sutter gave the name of New Helvetia, and it had already received considerable development, when, in 1841, he solicited of the governor "eleven leagues of land in his establishment of New Helvetia, situated towards the north, according to the land represented in the sketch." The governor accordingly grants for him and his settlers, the said land called New Helvetia, and in the third condition defines its boundaries as has been stated. It is suggested by the supreme court that even without the aid of any map whereby we could learn the actual location of the southern parallel of latitude called for in the grant, a question might arise whether the general description of "New Helvetia" should not overrule the particular description by metes and bounds contained in the third condition. "But with the map which shows that the line of the southern boundary is south of New Helvetia, we have no difficulty in including it in the grant." It is evident that the supreme court did not anticipate that if New Helvetia was found to be within the exterior boundaries, any location of the eleven leagues so as not to include it would be made. The court even seems to have considered that the designation in the grant of the extensive and well known establishment of Captain Sutter might overrule the description by lines of latitude contained in the third condition, even without the aid of the map, which showed by natural objects the position of the southern boundary. Assuming then, that early settlement, extensive improvements, and the designation of New Helvetia by name, must be taken to have fixed the location of the grant so far at least as that New Helvetia must be included in it, we proceed to ascertain its boundaries. The place called New Helvetia before the grant was made, appears to have had no definite limits. The fort, which was its headquarters, and the land in its vicinity, are stated by the captain to have been understood to embrace all of New Helvetia. The designation, therefore, of New Helvetia in the grant, in no respect assists us in fixing its southern and eastern boundaries, which are disputed. In the official survey a southern boundary has been adopted, which corresponds neither with the line of latitude marked "lindero" on the map, nor with the line run by Vioget, nor even with the green map, which was placed in the hands of the surveyor. The location of the land has been fixed in accordance with a statement of Vioget that he intended to measure exactly two leagues below the American, and that he included a larger quantity because he erroneously reckoned the Spanish league as equal to three terrestrial miles. The line of the survey has therefore been made to correspond with that of Vioget for only a portion of its extent, and it leaves it at a point from which when extended to the American river, it will embrace exactly two leagues. But this location is open to insuperable objections. There is no proof whatever that the governor had any knowledge of Vioget's alleged intentions with respect to the quantity of land to be located in the vicinity of the fort, or that he adopted the boundary described in the grant and delineated on the diseño under the impression that it would include two Spanish leagues and no more. Nor does Sutter himself appear to have at any time, supposed that he was confined within a boundary which should include that precise quantity. In the year 1841 he states that he broke the ground for a vineyard and planted vines at a spot which is to eastward of the line of the official survey, and in 1847 he constructed a flour mill near the same place, at an expense of $24,000. The race for this mill commenced near an oak tree, which by al-

most all the witnesses who were early resi-dents of the country, is stated to have been well known as the eastern landmark of New Helvetia. Hall, Buzzell, Bidwell, and many other witnesses, identify the "blazed oak tree on the southern bank of the Amer-ican river, about fifty yards above Sut-ter's old mill-dam, or where the mill-race commences." This tree is stated by Von Schmidt, the surveyor, to be four miles to the eastward of the line run by him as the eastern boundary. It is shown that among the earliest colonists whom Sutter estab-lished on his land were Atkinson, Mont-gomery, Perry McCoon, Wyman and others, who seem to have been settled on the land south of the American river, and near the eastern boundary, which has been excluded from the official survey. The oak tree re-ferred to by the witnesses is situated at or near the spot where, as Vioget states, the line ran by him terminated; and it like-wise corresponds with the eastern termina-tion of the dotted line marked on the map B. P. L. I am unable to perceive on what grounds I should be justified in refusing to treat it as the eastern limit of the grant.

With regard to the southern boundary, a more difficult question is presented. The grant states that the land is bounded on the south by the parallel 38 deg. 49 min. 32 sec. of north latitude. The map B. P. L. shows the true situation of the line so designated. The western termination on the Sacramento river of the line is not seriously disputed. It is testified to by Vioget, whose deposition with regard to its actual location, was ac-cepted by the board and adopted by the su-preme court as sufficient and controlling evi-dence on the point. It is contended that that parallel forms the southern boundary throughout its whole extent, until it meets the eastern boundary. In other words, that the southern boundary line is a line drawn due east from the Sacramento at the point of beginning as testified to by Vioget, and that the eastern boundary is a line drawn nearly south from the blazed tree before mentioned, until it meets the southern bound-ary. In support of this theory, it is argued with great force that the grant calls for that parallel as a boundary, and not for any line run by Vioget which differs from it. That it appears from the testimony of the early set-tlers that Sutter's eastern line was univer-sally recognized as running south from the blazed tree until it intersected a line drawn due east from the Sacramento. That in the grant to Leidesdorff of land on the American river immediately eastward of Sutter, and which extended two leagues south of that river, the boundary line between these grants is represented as running in a southerly di-rection for two leagues. And that in the map of the Sacramento valley, made by Bidwell in 1844 at the request of Governor Michelto-rena, and compiled from the grants and maps in the archives, the land of Sutter below the

American is represented as nearly a square shape, and bounded on the south and east by the lines contended for. It is further urged that the land in the southeast corner which would thus be included, constituted at that time, the most valuable portion of the tract, and that in 1850 it was sold for a large sum to R. Gelston, who has separately presented his claim for it, and now intervenes for his interest. On the other hand, it is urged that Vioget's deposition conclusively shows where the southern boundary was in fact run. That it was delineated on the map by a dotted line, which, as it could not then have been intended to indicate the division between high and tule lands, must have been meant to indicate the boundary of the tract solicited, and that the mention of the parallel 38 deg. 49 min. 32 sec. in the grant, does not show that the governor meant to establish it as a boundary throughout its whole extent, par-ticularly as no eastern termination is given. But that it was mentioned as the southern limit of the tract because the southern bound-ary as shown by the dotted lines, com-menced at the same point on the Sacramento river and for a short distance coincided with it. The question, however, seems no longer an open one. In the decree which was af-firmed by the supreme court, the tract is de-scribed as bounded on the south by a line drawn due east from the Sacramento river, so as to touch the most southerly point of a pond or lagona situated near such river, and about five miles south of the American river, as represented on the map filed in the case, and marked B. P. L., which line is also mark-ed "lindero latitud norte, 38 deg. 49 min. 32 sec." As to the line so marked on B. P. L., there can be no question. It must therefore be accepted as the southern boundary of the tract, notwithstanding that except for a short distance at its western extremity it differs from the dotted line which Vioget swears he ran for a boundary.

Assuming, then, that the grant embraced all the land contained between this southern boundary and a line run southerly from the "blazed tree," the question arises whether the location should now be made to embrace this large tract, to the exclusion of lands equally within the grant which Sutter had conveyed to other parties long before his deed to Gelston. It has already been re-marked that, as a general rule, the convey-ances to third persons by a Mexican grantee of portions of the land within his exterior limits may justly be considered as an election of the location, and as estopping him to make any subsequent election inconsistent with it; yet the building of a house and other improvements, and an ancient and notorious cultivation and occupation of a particular portion of the land, would seem to afford as decisive evidence of an election as the conveyance (it might be, without considera-tion) of some other portion; and that the pur-chaser of the house and improvements might

justly claim that the election was made and the location fixed by the grantee so as not to be affected by any subsequent conveyance, of which he, the purchaser, may have had no notice; that the reasoning applied with great force to a case like the present, where the effect of determining the location by the dates of conveyances alone would be to exclude from the survey the great establishment of Sutter, upon which he had settled so many persons, which gave a name to, and was the principal consideration for making the grant. But these considerations furnish no answer to the perplexing and difficult question, to what extent must the establishment of Sutter be deemed to have located his grants? If, for example, his boundary had been a league or more further to the south, should the occupation and cultivation of the fort be treated as having located the grant upon the eight or nine leagues which would then have been found south of the American river, to the exclusion of those lands which he, soon after the grant, and in execution of the trust confided to him, distributed among his settlers, and which were "situated towards the north," as asked for in his petition. It would seem more just to treat the establishment at New Helvetia as locating the grant upon its site and the adjacent lands, to such an extent as, while it satisfies the principle that his establishment fixed to a certain degree his location, will at the same time enable us to protect the rights of early colonists, for whose benefit in part Sutter received his impressario grant, and whom he at once proceeded to establish upon the land. The quantity of land thus to be assigned to New Helvetia is of course to a certain extent arbitrary. I have been unable to discern any better line of limitation than the original line run by Vioget. This, although not adopted by the governor nor by the supreme court, as the southern exterior limit, was, nevertheless, if Vioget is to be believed, run by him as the boundary of the tract to be solicited. That Vioget ran some line as a boundary cannot be doubted; and Sutter himself, in his deposition taken on behalf of Gelston, cordially testifies from a confused and uncertain recollection of the line as established by Vioget. To question 11, "How do you know the eastern line runs south by east?" he says: "I do not know exactly, and don't like to make a mistake. It was fixed by Vioget when I showed him what land to take. Question 12. What are your means of knowledge that the eastern line was ever fixed? Answer. Vioget told me so; he told me he had surveyed it. Question 13. Did he describe to you what boundaries he had surveyed? Answer. Yes; he described them to me, but I cannot describe them. I cannot without riding over the grounds or having my papers, tell much about them. Question 14. Did Vioget inform you how he ran the eastern line; if yea, what information did he give you? Answer. It is now so long ago I do not know what information he gave me. Question 16. What landmarks do you know on the southern line? Answer. I know of none; I have to refer to the surveyor."

In answer to question 22, which related to other lines, he says: "I am not personally familiar enough with these lines to give testimony satisfactory to myself; I am not willing to make mistakes under oath; I cannot answer the question definitely; I refer to the surveys that have been made by Captain Vioget." It is evident from these statements that Sutter considered his boundaries to be the lines run by Vioget, of which, however, he seems to have had a very confused idea; and this conclusion is corroborated by the circumstance that he does not appear to have made any conveyance of, or settlement upon, lands outside of those lines, until in comparatively recent times and after the grant of the Sobrante, which gave him all the lands included in his map. If to these considerations we add that the map itself indicates by dotted lines the boundary which Vioget testifies he ran, and that the land south of those lines, and between them and the parallel of latitude, is marked "Tierras Steriles," it will, I think, be evident that, as against the early colonists of the more northern portions of the tract, we ought to restrict the location of the New Helvetia portion within the lines originally run by Vioget, and delineated on the map which the supreme court has pronounced to have been proved. But it is objected that, of the land lying south of the American river, all those portions which were liable to overflow from the force and currents of the river are to be excluded. That a considerable portion of the tract, including in great part the site of the present city of Sacramento, is overflowed whenever there are floods or freshets in the river, is not only testified to by the witnesses, but demonstrated by the fact that the city of Sacramento has found it necessary to construct very extensive levees at great expense. But it also appears that a great part of the land on the margins of Feather river is liable, in a greater or less degree, to inundation from the same cause; and at periods of extraordinary floods the whole country is submerged except a few high points of land which rise like islands above the waters. The land thus occasionally overflowed yields abundant pasturage throughout the greater part of the year, and it is even said to be superior in that respect to the high land, which is never submerged, though it is doubtless unfitted for the production of cereals. The dotted lines on the map B. P. L. along the Sacramento and Feather rivers, are stated by Vioget to have been intended to mark the limits of the available land which was solicited; but if, construing the grant as is proposed, we exclude all the lands which were liable to inundation, a large, and perhaps the greater portion of the lands along the rivers included within the dotted lines will be excepted from the grant,—

lands which were the first granted by Sutter, on which his earliest colonists were settled, and which have ever since been held under the title so acquired. The dotted lines, running nearly east and west on either side of the American river, could not, like those which followed the course of the Sacramento and Feather rivers, have been intended to mark the division between the high lands and the tule swamps. But if, as we are bound to assume, they were upon the original diseño as they now appear on B. P. L., they would seem to show that Sutter intended to solicit, and the governor to grant, all the land included within them. The testimony of Vioget is positive to the fact that he ran the southern line so as to include the whole tract lying in the angle formed by the Sacramento and American rivers. That Sutter, who at the date of his petition has already formed his extensive establishment at the fort, should have intended to exclude from his grant an irregular and undefined strip of land immediately adjacent to it, and lying between that building and the place on which his embarcadero was situated, would seem highly improbable especially as he had already to some extent cultivated and established his Indian servants upon it; as it afforded good grazing for his cattle throughout the greater part of the year,—and was suitable for the cultivation of vegetables,—and above all, if it be true as stated, that the two years during which he had up to that time occupied the fort, had been remarkable for the absence of rain, and no floods had within his experience occurred to apprise him of the liability to inundation of the land  It is also to be observed that the governor, in excluding from the grant the lands periodically overflowed by the impelled currents of the river, merely adopted a suggestion contained in the petition of Sutter, evidently intended as explanatory of the sketch which he submitted. When, therefore, the governor granted him the eleven leagues, as exhibited on the map, without including the lands Sutter desired to except, he may not unreasonably be considered to have accorded a privilege to, rather than imposed a restriction on the grantee, by permitting him to take all the land supposed to be fit for cultivation and settlement, but to reject, if he saw fit, the swampy and unavailable portions which were included within the limits of the map. When, therefore, he saw that immediately adjacent to the establishment of Sutter a tract was laid out, contained within dotted lines, which could have served no purpose but to indicate its boundary,—when the same lines were continued north along the margins of the rivers, while outside of them the lands were marked "Tulares y Tierras Esteriles,"—it is unreasonable to suppose that he meant to prohibit the grantee from occupying a portion of the land within those lines, insignificant in extent, though important now as the site of a city, merely because on a more accurate examination it might be found to come within the terms of the description of the land which the grantee was not bound to take.

For these reasons I am of the opinion that the settlement at the fort, and the extensive establishments erected in its vicinity at so early a day by the grantee, must be taken as an election of a location which neither he nor purchasers claiming under him can now disturb, and that that location must be taken to embrace all the land lying between the American and Sacramento rivers and the dotted line delineated on the map B. P. L., which I understand to coincide substantially with the line actually run by Vioget and described in his deposition. With respect to the remainder of the tract, I know of no rule by which to be governed except to treat the conveyances by Sutter to his colonists as operating as successive locations of portions of the tract in the order of their dates. The first distribution of lands made by Sutter under his impressario grant, was by lease for nine years to Cordua et als. of the north-eastern portions of the tract lying between the Yuba and Feather rivers. This lease was made renewable for a second term of nine years. The reversion has since been bought by the assignees of the lessee, and a claim for the land has been separately presented and confirmed in the case of U. S. v. Covilland [1 Black (66 U. S.) 339]. Under the title thus acquired the land has been occupied since January, 184?. It is objected that the original conveyance did not transfer the whole title, but was merely a lease; the present owners of the land have only such right to priority of location as the release of the reversion would confer upon them, and as the date of that instrument is later than that of several conveyances by Sutter of other portions of the tract, the grant must be located so as to embrace the latter. But the question is, not what particular estate for life, for years, or in fee, may have been originally acquired, by those who settled upon the land under Sutter, but whether the latter has done any acts, or created any interests which limit and control the right of electing the location of his grant which he might otherwise have exercised. When, therefore, Sutter having obtained a concession for the express purpose of settling families upon it, within eighteen months of its date, and as his first act under it not only establishes a colonist upon its most remote and dangerous frontier, but executes to him a lease for nine years, renewable for nine years after the expiration of the first term, it seems clear to me that neither he nor any subsequent purchaser under him is at liberty to give to the tract any location which will not embrace the lands so emphatically affirmed by him to be within its limits. No objection has been made by those representing this claim to the northern boundary, as established by the official survey. That boundary must therefore be

preserved, and the grant to Sutter located so as to embrace the lands to the south of it included within their original lease provided, and so far as they are contained within the dotted lines marked on the map B. P. L. The conveyance next in date is that to Grimes and Sinclair. But independently of the fact that, through some strange misconception of his rights, Sutter appears to have attempted to convey a tract much larger in extent than the whole quantity granted to him, the boundaries of the tract so conveyed are not only beyond the boundaries mentioned in the grant, but would extend according to the scale on the diseño, considerably beyond the margin of the paper on which it is drawn. Grimes himself seems to have been aware that the title so acquired from Sutter was in great part void, and he at an early day applied for and obtained from the Mexican government a grant for ten square leagues, embracing a part of the land conveyed by Sutter. But, it has already been observed that the map B. P. L., when taken in connection with the words of the grant, excluding from the tract the lands overflowed by the currents of the river, indicates unmistakably what were the boundaries of the land intended to be excluded, and especially with reference to the lands east of the Sacramento river, and below the mouth of the Feather, are we compelled to accept the dotted line as indicating the boundary of the tract; for, otherwise, there would be no eastern boundary whatever. The only eastern boundary mentioned in the grant is "the margins of the Feather river. This description, though, without the aid of the dotted lines it would be vague and undefined, might still be accepted as affording some indication of the extent towards the east of that northern portion of the tract." But for that part of it towards the south, and below the mouth of the Feather, it would afford no eastern boundary whatever, and the grantee would have been at liberty to extend his land indefinitely in that direction, or at all events so as to comprise all the land lying between the Sacramento and the margin of the map —lands which are marked upon it as "Tulares y Tierras Steriles," and which are obviously intended to be excluded. For these reasons, it seems to me clear that only that portion of the land conveyed to Grimes can be included in the location, which lies along the American river, west of the limits of his ten league-grant, along the Sacramento river, and between those rivers and the dotted line marked upon the map B. P. L.

It is stated by Vioget, when describing the measurement of the squares heretofore alluded to, that he laid off a small strip of land on the Sacramento, but did not intend to include in it the grant. But there is no evidence that this intention was known to or acted on by the governor. The strip is clearly within the limits described in the grant, and marked on the diseño B. P. L. It appears on that map as much a part of the land solicited as the wider portions of the same tract where the dotted lines, as they extend northwards, gradually diverge from the rivers. The land has been treated as his own by Sutter, and I can see no reason for concluding that it was not a part of the tract out of which the eleven leagues were to be taken. Various other conveyances by Sutter have been proved, but it is not necessary specially to refer to them. It is sufficient here to say that each of them successively should be taken as fixing the location of the grant, as to the lands embraced in them. They are understood to be within the limits of the general boundaries, and of the dotted lines on B. P. L., and will be particularly mentioned by names and dates in the order of a new survey, to be entered in pursuance of this opinion. It is believed that under this location all of the lands covered by the earlier conveyances made by Sutter before receiving the Sobrante grant will be included in the survey to be made. These have evidently the higher equity. For they were made in execution of the trust created by and out of the lands conveyed in the just grant which has alone been confirmed,—while the later conveyances may have been in great part intended as transfers of rights supposed to have been acquired under the Sobrante grant, which has been rejected by the supreme court. I have felt more difficulty and embarrassment at arriving at a conclusion in this case than in any other it has been my duty to decide. The undefined character of the exterior boundaries; the loss of the original maps; the inconsistencies and differences in the maps which have been presented as copies: the entire absence of any rules settled by judicial authority, which might have guided me in making a location of the comparatively small tract of eleven leagues out of the large area included in the map; the numerous alienations by Sutter of lands greater even in extent than the quantity included in both grants, and of which until the decision of the supreme court, he was supposed to be the owner. All these circumstances have contributed to render it more than ordinarily difficult to arrive at any satisfactory decision.

I am fully aware of the force of the objections which may be urged against the conclusion to which I have come. The most that can be said is, that that conclusion is perhaps less objectionable than any other. Its correctness rests mainly on the answers to be given to the following questions: 1. Is the settlement at New Helvetia to be treated as a location by Sutter of at least a portion of his grant, to which any subsequent location by conveyances must be sub-

ordinated? 2. Is the location so made properly restricted to the land the boundaries of which were run by Vioget and delineated by dotted lines on the map B. P. L., or ought it to include all the land between the American river and the parallel of latitude drawn on the map and mentioned in the grant? 3. Should the lands shown to be subject to inundation at periods of high water be excluded from the tract? 4. Should the various sub-grants by Sutter be deemed to have operated as locations by him of the tracts conveyed, and should they now be successively included in the survey in the order of their dates, until the whole quantity granted is obtained? I have put the points on which this decision chiefly turns in this form in order that the attention of the supreme court may more directly be drawn to them, and in the hope that in the answers to be given to them by the superior tribunal, I may be furnished with some definite rules, established by the highest authority, to guide me in this most difficult and perplexing class of cases.

[NOTE. An appeal was taken to the supreme court, where the decree of the district court confirming the survey and location of 11 square leagues to Sutter, approved May 11, 1863, was reversed and set aside, and the survey and location of the grant by A. W. Von Schmidt, approved February 18, 1860, substituted in place thereof. The case was remitted to the district court, with directions to confirm the survey as to the location of the said grant. 2 Wall. (69 U. S.) 562.]